**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

TAHMID FEROZ, ADONIS BUNCH, MANUEL DE JESUS RODRIGUEZ MENDEZ, LEVON THOMAS, FURUI ZHOU and CHRISTIAN FELTMAN individually and on behalf of all others similarly situated,

Plaintiff,

-against-

ACADEMY OF AVIATION LLC,

Defendant.

Case No.: 25-cv-03559-JMA-ST
Hon. Joan M. Azrack

**FIRST AMENDED CLASS ACTION COMPLAINT**

**Jury Trial Demanded**

1. Plaintiffs, Tahmid Feroz ("Mr. Feroz"), Adonis Bunch ("Mr. Bunch"), Manuel De Jesus Rodriguez Mendez ("Mr. Rodriguez"), LaVon Thomas ("Mr. Thomas"), Furui Zhou ("Mr. Zhou"), and Christian Feltman ("Mr. Feltman") (collectively, "Plaintiffs" or "Students"), individually and on behalf of all others similarly situated, bring this class action against Academy of Aviation LLC ("AOA" or the "Company"), and allege as follows upon personal knowledge as to the Plaintiffs' own acts and experiences, and upon information and belief, including the investigation conducted by their attorneys, as to all other matters:[1]

## NATURE OF THE ACTION

2. Plaintiffs, individually and on behalf of all others similarly situated, bring this class action against AOA in connection with its systematic pattern of deceptive, fraudulent, and discriminatory practices in the marketing, enrollment, and provision of flight training programs at the Company's multiple locations across the United States.

---

[1] The Plaintiffs' Training Enrollment Agreements are attached hereto as Exhibits A–F.

3. More specifically, AOA operates flight schools in multiple states (including New York, Georgia, North Carolina, and Florida) and advertises various accelerated pilot training programs that promise completion of multiple pilot certifications within compressed timeframes.

4. In reality, AOA has knowingly enrolled far more students than its fleet of aircraft and instructors can accommodate, making it impossible for students to complete their programs within the advertised and contractually promised durations. In fact, AOA's business model depends on students "timing out" of the initial fixed-cost program periods and then being forced to pay additional fees or incur more debt to continue training.

5. The effect of AOA's scheme is devastating. AOA preys on aspiring pilots – often young individuals or foreign nationals unfamiliar with U.S. flight training – luring them with false promises of fast, guaranteed pathways from "zero experience" to professional pilot in a matter of months. Students pay enormous tuition (often financed by loans) only to find themselves unable to obtain the promised licenses and ratings within the promised time. Many run out of money or visa status before obtaining any pilot certification, leaving them with no certificates, no job prospects, and crushing debt. AOA's conduct is not an unfortunate accident or mere negligence, but a calculated and fraudulent enterprise that defrauds students nationwide.

6. AOA's scheme also involves intentional discrimination against international students. A significant portion of AOA's students are non-U.S. citizens on M-1 student visas (at least 88 international students were enrolled in 2023). These students are uniquely vulnerable because their legal ability to remain in the United States depends on making continual "satisfactory progress" in the program. When AOA's resource shortfalls prevent timely completion, international students face a coercive ultimatum: pay substantial additional fees to extend enrollment (and thus their visa status) or be dismissed and face visa termination and deportation.

7. Upon information and belief, AOA deliberately exploits this vulnerability by threatening to terminate students' visa support (their required Form I-20) if they do not acquiesce to paying for extensions or the so-called "dematriculation" program at higher hourly rates. This conduct constitutes unlawful national origin discrimination in the provision of educational services.

8. Plaintiffs – six former AOA students who collectively paid hundreds of thousands of dollars to AOA – bring this action on behalf of themselves and all others similarly situated, in this Court pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), to recover damages and injunctive relief for AOA's violations of New York General Business Law §§ 349 and 350 and AOA's commission of common-law breach of contract, promissory estoppel, fraudulent inducement, fraudulent misrepresentation, and fraudulent concealment. Plaintiffs also seek rescission of the unenforceable enrollment contracts and any additional relief deemed just and proper.

**JURISDICTION AND VENUE**

9. This Court has diversity subject-matter jurisdiction over this class action pursuant to the Class Action Fairness Act of 2005, Pub. L. No. 109-2, 119 Stat. 4 ("CAFA"), which, *inter alia*, amends 28 U.S.C. §1332, at subsection (d), conferring federal jurisdiction over class actions where, as here:

a) the proposed class will vastly exceed 100 members;

b) at least some members of the proposed class are citizens of states different than AOA, a New York corporation with its principal place of business in New York; and

c) the amount in controversy exceeds the value of five million dollars ($5,000,000) in the aggregate.

10. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to these claims occurred in this District, and AOA's principal place of business is located at 7150 Republic Airport, Room 101, Farmingdale, NY 11735, within this District.

## PARTIES

11. Plaintiff Tahmid Feroz is an individual residing in New York. Mr. Feroz enrolled in AOA's "First Flight to First Officer" vocational program at the Farmingdale location in or about December 2023. Mr. Feroz signed a Training Enrollment Agreement ("TEA") on December 13, 2023, with a program start date of January 1, 2024, and a scheduled completion date of January 1, 2025. Mr. Feroz's program tuition and fees totaled $91,012.50 (financed via a Sallie Mae loan of approximately $91,013.00). As described below, AOA's conduct has prevented Mr. Feroz from completing the program on schedule.

12. Plaintiff Adonis Bunch is an individual residing in New York. Mr. Bunch enrolled in AOA's "Zero to Hero" vocational flight training program at AOA's Farmingdale, NY location in August 2022. Mr. Bunch signed a TEA on August 2, 2022, and the program was scheduled to begin on August 15, 2022, and conclude 12 months later on August 15, 2023. As detailed below, Mr. Bunch paid AOA approximately $79,755.00 in tuition and fees (financed via an $80,000 Sallie Mae student loan) for this program but was unable to complete the promised flight certifications within the contracted timeframe.

13. Plaintiff Manuel Rodriguez Mendez is an individual residing in New York. Mr. Mendez enrolled in AOA's "Private Pilot License" training program at the Farmingdale location in March 2024. Mr. Mendez signed a TEA on March 1, 2024, with a course start date of March 9, 2024, and a projected completion date of June 9, 2024. He paid AOA $11,630.00 in total (tuition

and fees), financed via a Sallie Mae loan in the same amount. As described below, Mr. Mendez was likewise unable to complete his private pilot training within the promised timeframe.

14. Plaintiff LaVon Thomas is an individual residing in Maryland. Mr. Thomas enrolled in AOA's "Zero To Hero Accelerated" program at the Farmingdale location in late 2022. Mr. Thomas signed a TEA on November 3, 2022, with a course start date of November 28, 2022, and a projected graduation date of April 28, 2023 (*i.e.*, a 5-month accelerated timeline). Mr. Thomas paid approximately $81,425 in tuition and exam fees to AOA, financed by a Sallie Mae loan of $93,200.00 (which included about $9,670.00 earmarked for his living expenses while training out-of-state in New York). Despite uprooting his life to attend AOA's accelerated program, Mr. Thomas was unable to complete any of the promised pilot certifications by the projected end date, as detailed below.

15. Plaintiff Furui Zhou is an individual and Chinese national who resided in New York on an M-1 student visa while enrolled at AOA. Mr. Zhou enrolled in a comprehensive sequence of AOA programs – including Private Pilot License ("PPL"), Instrument Rating ("IR"), Commercial Pilot ("CPS"), and Multi-Engine Add-On ("CPM") – at the Farmingdale location in early 2023. He signed a TEA on March 13, 2023, with his training set to begin March 14, 2023, and scheduled to conclude by March 14, 2024. Mr. Zhou paid AOA approximately $54,490.00 out-of-pocket for tuition, non-tuition, and exam fees (he self-financed his training without U.S. loans). As an international student, Mr. Zhou's enrollment was subject to strict time limits due to visa regulations – limits that AOA knew he could not meet given their lack of capacity. Indeed, Mr. Zhou did not complete the program by the scheduled date, for reasons explained herein.

16. Plaintiff Christian Feltman is an individual residing in Georgia. Mr. Feltman enrolled in AOA's "Zero to Hero" vocational flight training program at AOA's Peachtree City,

GA location in January 2023. Mr. Feltman signed a Training Enrollment Agreement ("TEA") on January 27, 2023, and the program was scheduled to begin on February 6, 2023, and conclude 12 months later on February 6, 2024. As detailed below, Mr. Feltman paid AOA approximately $78,580.00 in tuition and fees (financed via a Sallie Mae student loan) for this program but was unable to complete the promised flight certifications within the contracted timeframe.

17. Defendant Academy of Aviation LLC is a New York limited liability company with its principal place of business at 7150 Republic Airport, Room 101, Farmingdale, NY 11735. AOA operates FAA-approved flight training centers in New York, Georgia, North Carolina, and Florida. AOA markets its programs nationwide and internationally via the internet and recruits students from across the United States and abroad. At all relevant times, AOA was acting through its owners, officers, employees, and agents, including its founder, CEO, owner, and controller, Christopher M. Richards ("Mr. Richards"), who directed or authorized the wrongful conduct alleged in this Complaint. All such persons were acting within the scope of their authority and for the benefit of AOA, such that AOA is legally responsible for their actions.

## FACTUAL ALLEGATIONS

### I. AOA's Business Model and Program Structure

18. AOA markets itself as a premier flight training school with locations in New York, Georgia, North Carolina, and Florida, offering various flight training programs, including PPL, IR, CPS, CFI, and accelerated "Zero-to-Hero" programs that promise to take students from zero experience to multiple certifications in a matter of months.

19. For example, AOA advertised a "5-Month Zero-to-MEI Pilot Pathway," an "Accelerated Zero-to-Hero Program" (5 months), a stand-alone Private Pilot course in "6–8 weeks," an Instrument Rating in "3 weeks," a Commercial Pilot License in "4 weeks," and so

forth. Unbeknownst to students, these timelines were mathematically impossible given AOA's resource constraints, as detailed below.

20. Upon enrollment, every AOA Student executes a TEA, which sets out the program(s) the student is enrolling in, the total tuition and fees, and critically, the maximum time allotted for completion of each course and the program as a whole.

**Maximum Course Allotted Time in Days**

| | |
|---|---|
| Private Pilot | 90 |
| Instrument | 90 |
| Commercial (Single/Multi | 120 |
| CFI | 60 |
| (Total) Career | 360 |

21. The TEA provides that if a student fails to complete a given phase of training within the allotted time (measured in days from the agreed start date), the student must pay additional fees to continue training beyond that point. In other words, AOA's "Price Guarantee" and "Fixed-Cost" tuition is only guaranteed if the student finishes on time – an outcome AOA knew was virtually impossible. This structure virtually ensures that students will exhaust their initial tuition and be forced either to pay more or abandon their training.

22. For students in "vocational" career-track programs (like Plaintiffs Bunch, Feroz, Thomas, Zhou, and Feltman), the TEA typically covers all certificates and ratings AOA offers. For example, Mr. Bunch's Zero-to-Hero TEA bundled the following seven certifications: PPL, IR, CPS, CPM, CFI, Certified Flight Instructor–Instrument ("CFII"), and Multi-Engine Instructor ("MEI"). These vocational TEAs set a single overall program length (*i.e.*, 12 months for Zero-to-Hero) along with internal deadlines for each certificate. By contrast, students in one-off

"recreational" courses (like Mr. Mendez's stand-alone PPL course) sign a TEA for that specific course (*i.e.*, 90 days allotted for PPL training).

23. All TEAs, however, contain the same core bargain: the student pays a fixed price in exchange for AOA providing sufficient resources, including flight lessons, available aircrafts, and instruction, for the student to meet FAA requirements and finish within the stated time.

24. This action does not challenge AOA's pedagogical judgment, instructional methodology, grading decisions, or the academic quality of flight instruction. Plaintiffs challenge AOA's failure to provide the specific, bargained-for inputs that made the programs and advertised average completion times possible: available aircraft, available instructors, lesson blocks, scheduling access, visa-support services for international students, and the fixed-price/time-limited structure AOA sold before enrollment.

25. Nor do Plaintiffs contend that AOA guaranteed that every student, regardless of aptitude, weather, attendance, or effort, would obtain every certificate by a specific date. The gravamen is materially different: AOA represented that its average completion times, fixed-cost pricing, and scheduled program durations were achievable for ordinary diligent students, while AOA knew its systemwide capacity made those outcomes unattainable even for diligent students who remained ready, willing, and able to train.

26. AOA, however, systematically breached its obligations under the TEAs by enrolling far more students than it could train in the promised time. From at least 2019 to 2024, AOA aggressively expanded enrollment without adding capacity, resulting in chronic scheduling bottlenecks that prevented students from completing courses on schedule. As described below, AOA's over-enrollment and resource shortages meant that even the most diligent student could not log enough flight hours or lessons per week to satisfy the program requirements within the

contractual timeframe. In practice, nearly all students fell behind through no fault of their own, triggering academic "warnings," forced extensions, extra payments, or withdrawals.

27. During the same time period, AOA: (i) was investigated by the FAA for failure to follow an approved Commercial Pilot-Reduced Hours Single Engine Land Syllabus, with student licensures being revoked; and (ii) lost its accreditation from the Accrediting Commission of Career Schools and Colleges ("ACCSC") for false marketing and failure to provide adequate resources to students.

## II. AOA's Uniform Pre-Enrollment Representations

28. During the class period, AOA marketed its flight training programs to prospective students through a centralized and uniform set of consumer-facing channels, including: (i) AOA's public-facing website at academyofaviation.com; (ii) social media accounts and online advertising; (iii) printed and electronic brochures and program guides distributed to prospective students; (iv) recruitment events, open houses, and discovery flights conducted at AOA's Farmingdale and other campuses; and (v) telephonic, electronic, and in-person communications between prospective students and AOA admissions representatives, who utilized standardized scripts and uniform talking points furnished by AOA management.

29. Through these channels, AOA made the following uniform pre-enrollment representations to Plaintiffs and Class members during the class period: (i) that AOA's programs would be completed within specifically advertised "average completion times," including a five-month "Zero-to-Hero" or "Zero-to-MEI" pathway, a Private Pilot License ("PPL") program in six to eight weeks, an Instrument Rating in three weeks, and a Commercial Pilot License in four weeks; (ii) that students would receive flight instruction at a frequency sufficient to complete the program within those durations, including, for full-time vocational students, up to twelve flight

blocks per week (two per day, six days per week); (iii) that AOA maintained a fleet of aircraft and a complement of certificated flight instructors sufficient to deliver the advertised frequency of training to all enrolled students; (iv) that AOA offered "Fixed-Cost Pricing" and a "Price Guarantee" that protected students from incurring additional tuition costs to complete the program; and (v) that AOA was an ACCSC-accredited institution.

30. The foregoing representations were uniform in substance across AOA's public-facing channels and were repeated, in materially identical form, in: (i) marketing materials and program-specific webpages; (ii) AOA's admissions and enrollment communications with prospective students; and (iii) the recitals and tuition-and-fee schedules in AOA's standard form TEAs presented to all incoming students, including Plaintiffs.

31. Each Plaintiff, prior to executing his TEA and incurring tuition obligations, personally reviewed AOA's academyofaviation.com website (including the program-specific pages reproduced in this Complaint) and personally communicated, in writing or by telephone or in person, with one or more AOA admissions representatives. In each such pre-enrollment communication, the AOA representative confirmed, in substance and in conformity with AOA's uniform talking points, that the Plaintiff would be able to complete the program for which he was enrolling within the advertised duration and at the advertised cost, given AOA's purported aircraft fleet, instructor staffing, and scheduling capacity at AOA's campuses.

32. Plaintiffs and Class members actually saw, read, heard, and considered each of the representations described above and the corresponding paragraphs of this section before electing to enroll, signing their TEAs, and paying tuition and fees. Plaintiffs and Class members reasonably relied on those uniform representations in deciding to enroll at AOA rather than at a competing flight school, in deciding to incur the substantial tuition and financing obligations associated with

enrollment, in deciding to relocate (in some cases across state lines) to attend AOA, and, for the international students in the proposed International Student Subclass, in deciding to obtain F-1 or M-1 visa sponsorship through AOA. Had Plaintiffs and Class members known that AOA's actual aircraft and instructor capacity rendered the advertised completion times mathematically impossible (as detailed below), they would not have enrolled, would not have paid the tuition and fees they did, and would not have incurred the loan obligations and relocation costs they did.

33. The information necessary to assess the truth of AOA's pre-enrollment representations (*i.e.*, actual average completion times, AOA's actual aircraft inventory, instructor headcount, current student enrollment, scheduling utilization, weekly flight-block availability, historical on-time completion rates, and accreditation status) was within AOA's exclusive possession and control. None of that information was disclosed to prospective students, discoverable through reasonable inquiry by prospective students, or available in any public source. Plaintiffs and Class members had no means of verifying through ordinary diligence whether AOA's advertised completion times were achievable given AOA's actual operational capacity. By contrast, AOA at all relevant times knew, or recklessly disregarded, the disparity between its advertised representations and its actual capacity to deliver the promised training, and AOA knew, or recklessly disregarded, that prospective students were enrolling and paying tuition in reliance on those representations.

34. None of the Plaintiffs (nor any student during the relevant time period) was provided with AOA's course catalog prior to enrollment and/or execution of their TEA.

35. Any generic caveat in the Course Catalog or TEA stating that completion times could vary based on student ability, weather, attendance, testing availability, or other individualized circumstances did not disclose the capacity defect alleged here. A reasonable

prospective student would understand such caveats to address individualized variables, not a concealed, school-created shortage of aircraft, instructors, and flight blocks that prevented AOA from delivering the advertised training frequency to the enrolled student body.

36. Plaintiffs could not reasonably discover that capacity defect before enrollment. AOA alone possessed the nonpublic information necessary to evaluate the truth of its representations, including real-time student enrollment, aircraft utilization, instructor availability, historical completion data, cancellation data, dematriculation data, extension revenue, and the number of students simultaneously competing for the same aircraft and instructor slots.

## III. Over-Enrollment and Misrepresentation of Resources

37. Despite marketing its programs with specific durations, average completion times, and guaranteeing the availability of aircraft and instructors, AOA systematically enrolled far more students than it could reasonably accommodate with its limited resources.

38. For example, at its Farmingdale, New York location (where five Plaintiffs enrolled), AOA had only six (6) training airplanes available for student lessons.[2] Yet AOA continuously kept 300–400 students enrolled at Farmingdale at any given time, without ever capping or pausing new enrollments.

39. Simple mathematics confirms that AOA could not deliver the promised lesson frequency. Six airplanes operating full-time can only support roughly 294 two-hour flight lesson slots per week at Farmingdale.[3] If each student were to fly the four lessons per week that AOA's

---

[2] The tail numbers for AOA's Farmingdale aircraft during the relevant time period are: (i) N291HW; (ii) N5253C; (iii) N61942; (iv) N9004W; (v) N926JA; and (vi) N429LH.

[3] Each day, AOA offers seven two-hour training blocks from 6 a.m. to 8 p.m. Thus, in Farmingdale, with seven flight blocks, six planes, and seven days per week, the Company offers 294 training blocks per week.

programs stipulate (*i.e.*, 4 flight blocks/8 hours per week), Farmingdale could accommodate at most 73 students.[4]

40. However, based on information and belief, AOA enrolls between 300 and 400 students at its Farmingdale location at any given time (without ever capping and/or closing enrollment), making it mathematically impossible for students to receive the promised frequency of flight instruction needed to complete their programs within the advertised timeframes.

41. Thus, if the available flight blocks were divvied up evenly, each student would only be able to fly a maximum of one time per week (*i.e.*, one two-hour flight block per week), and it would take each student more than 17 weeks to log the minimum 35 hours of flight time required by the FAA to obtain a PPL—the average 60 to 80 hours needed by most students to obtain a PPL would take up to 40 weeks.[5]

42. However, AOA's TEA gives a PPL student only 90 days (approximately 12-13 weeks) to finish the PPL course. In short, it was an impossibility for any student to complete a PPL in the time AOA allotted. It was equally impossible as applied to every other course AOA offered as none of the advertised timelines were achievable under the actual flight schedule limitations.

43. Notably, these conclusions hold true even if one accounts for "cancelled" lessons (a term AOA uses for flights missed due to weather, maintenance issues, instructor unavailability, or student requests). No amount of perfect attendance or motivation could overcome the math: AOA sold far more training "slots" than it could ever deliver on time.

---

[4] This figure represents the sum of the total 294 training blocks at the Farmingdale location divided by four (*i.e.*, the hypothetical number of flight blocks designated for each student).

[5] The actual number of total weekly flight blocks is fewer than 294 because other factors like weather and maintenance prevent all potential flight blocks from being used, rendering this hypothetical a conservative estimate for potential flight time at AOA Farmingdale.

44. Similar resource constraints existed at AOA's other locations, where the ratio of students to aircraft made completion within the advertised timeframes mathematically impossible.

45. More specifically, across all of its campuses, from June 2021 to December 2022, AOA maintained 40 aircraft at its Farmingdale, NY; Westchester, NY; Gastonia, NC; Atlanta, GA; and Orlando, FL locations (*i.e.*, KAKH, KFFC, KFRG, KHPN, and KISM).

46. Over the same time period, AOA had "about 700 students."

47. With 40 planes offering seven two-hour blocks per day across seven days, AOA could generate a maximum of 1,960 weekly flight slots. At the contractually stipulated training frequency of four blocks per week, AOA could accommodate approximately 490 students–yet AOA's confirmed enrollment was nearly double that figure (*i.e.*, 700 students).

48. At those enrollment levels, each student across AOA's campuses could fly at most twice per week, for a total of 4 hours.

49. Logging the typical 60–80 hours required for a PPL would take 15–20 weeks (i.e., 105–140 days). The TEA allotted 90 days.

50. The math is irrefutable: ***AOA sold a product it could not deliver***.

51. This was not negligence. AOA's internal records confirm that management was aware of the capacity shortfall and of their deceptive marketing practices regarding the Company's nonaccredited programs (*i.e.*, those in which the Plaintiffs were enrolled), but they continued to enroll aggressively without adding aircraft, instructors, or any capacity.

52. Plaintiffs are informed and believe, and discovery is expected to confirm, that AOA management tracked student progress, aircraft utilization, instructor utilization, cancellations, warnings, extensions, dematriculations, and completion outcomes through centralized systems.

Those records gave AOA contemporaneous notice that its advertised durations and fixed-cost promises were materially false or misleading when made.

53. In fact, in its September 19, 2022 response to an ACCSC letter outlining its decision to place AOA on probation from accreditation, AOA even went so far as to describe the non-vocational programs that 97% of its students enrolled in (and all of the Plaintiffs) as "not satisfy[ing] . . . standards for excellence in education," and "not the best option for aspiring pilots," because "most students will likely be unsuccessful."

54. Indeed, the same response letter noted that the overwhelming majority of enrolled students failed to complete their programs within the contractually allotted timeframes or "average completion times."

55. As AOA put it in writing to the ACCSC, students in the non-accredited programs "almost never complete on time."

56. If AOA's promises were genuine and achievable, one would expect a reasonable completion rate. Instead, the data reveals near-universal failure to complete on time (*i.e.*, precisely what Plaintiffs' mathematical analysis predicts).

**IV. Deceptive Marketing Practices**

57. AOA was fully aware of this capacity shortfall but continued to enroll new students and represent that they could finish in the stated time. AOA's own promotional materials touted specific average completion times and "guaranteed" program lengths that it knew were false.

58. For instance, AOA advertised that an "Accelerated Zero-to-Hero" student could go from zero experience to MEI in five (5) months, and a stand-alone IR could be done in three (3) weeks. In reality, no student at Farmingdale could obtain an IR in three (3) weeks when flights were so scarce – many waited weeks just to get a single instrument lesson in a simulator or plane.







59. And, in January 2022, when several of the Plaintiffs were searching for a flight school, AOA falsely claimed that its "5-Month Zero-to-MEI Career Pilot Pathway" offered the "Fastest 5-Month Commercial Program in the USA."

60. The Company also falsely touted "average completion times" for "Full Time Career Pilots" enrolling in other (and constituent) programs that it was incapable of satisfying:



**What is considered a full time career student and how many days should I train per week?**
Full time Career Pilots should expect a minimum of 6 hours of flight or simulator per week.

**How long do individual courses or programs take to complete?**
It will depends on your availability. The hours quoted are actual flight/sim hours. If you're available 3 days per week, our reservations are for 2 hour blocks of training. You can anticipate 6 hours per week. If your quote says 65 hours for your PPL, you're looking at finishing in 11 weeks. In addition to those flight/sim hours, you also have ground training to complete. If you attend a classroom setting, expect 2-3 weeks, depending on the progress of the class as a whole. If you are utilizing our online ground school, you will be assigned stages and phases in parallel with your training schedule to pair the theory you are learning with the physical skill.

Below is a list of average completion times:

From Zero Time - 12 months
From Private- 8 months

• Private Pilot - usually less than 4 months
• Instrument - usually less than 3 months
• Commercial Single - usually less than 2 months
• Multi Engine Add On - usually less than 1 month
• CFI - 1 month
• CFII - usually less than 1 month
• MEI - usually less than 1 month

61. Based on the math presented *supra*, it is impossible for AOA's "average completion times" to have been accurate.

62. AOA's actual "average completion times" were much longer and they should have included students like Plaintiffs and the Class members who were unable to complete their purchased programs.

63. Likewise, AOA's claimed "Fixed-Cost Pricing" and "Price Guarantee" were illusory, since AOA's model virtually ensured students would run out of included training hours and require extensions at additional cost. Indeed, while AOA publicly bragged about these policies as making training costs "fixed" and predictable, internally it relied on extra revenues from students who exceeded the time/hours in the initial package.

## Fixed-Cost Pricing

Academy of Aviation provides up-front, fixed-cost pricing in a way that differentiates us from most other flight schools and academies. With over 20 years of experience, Academy of Aviation designs flight training programs with enough flight time for the vast majority of students to be successful.

Academy of Aviation's prices are based on realistic minimum flight time requirements. If you require extra training above and beyond what's included in your curriculum, we will first try to reallocate flight time from other parts of the syllabus, changing the type of aircraft you fly for certain portions of training, and implementing simulator time before offering you extra flight training at an additional cost. The goal of Academy of Aviation is to ensure that you are prepared for a career as a pilot no matter what avenue of the aviation industry you choose.

Because everyone's piloting skills are different, we can't guarantee that you won't need additional training and incur some additional expenses. But Academy of Aviation has built a strong reputation for providing highly effective, safe and complete flight training programs.

**Price Guarantee**
Academy of Aviation guarantees the fixed-cost quoted to you at the time of scheduling or at the time of making your first payment to reserve your class date. Even if our advertised prices increase between the time you schedule and the time your training starts, you will receive the price originally quoted.

As a potential student and cosigner, there are three important facts you should know about Academy of Aviation's payment structure:
• Academy of Aviation receives payments incrementally throughout the program.
• Academy of Aviation quotes a fixed price.
•Refunds are issued in 15 days or less.

**Multi-Disbursement Payment Structure**
Academy of Aviation's multi-disbursement payment structure allows us to determine a student's ability to be successful in this career early in the program, prior to spending the entire amount of tuition. Unlike other flight schools, Academy of Aviation's program is structured so that Academy of Aviation is motivated to quickly discontinue those who are unlikely to excel at Academy of Aviation's pace. With a fixed-cost pricing structure, Academy of Aviation does not benefit from having to provide more and more training at an hourly rate—a common tactic found elsewhere.

64. The Company also failed to disclose that it classified all of its "Career" programs as "non-vocational," while devoting the majority of its resources to "vocational" programs that only 3% of its students enrolled in.

65. By over-enrolling and under-resourcing, AOA breached its contractual duties to provide adequate instructional resources. Each Plaintiff's TEA promised that AOA would make aircraft and instructors available at a frequency sufficient for the student to meet the program requirements within the allotted time. AOA's failure to do so not only constitutes breach of

contract but also underpins AOA's liability for fraud (as AOA misrepresented material facts about program duration and resources) and consumer protection violations. AOA's deliberate mismatch of enrollment vs. capacity demonstrates willful misconduct: the Company placed profits over the progress of its students, effectively dooming most students to failure unless they paid for additional hours.

66. Further, AOA marketed itself as "ACCSC Accredited" during 2022 and 2023, despite having been placed on probation in May 2022, with accreditation ultimately withdrawn in March 2023:

EST. 1998

**WHY ARE WE DIFFERENT THAN THE OTHER MAJOR FLIGHT SCHOOLS?**

You're Comparing Schools. You need this information. The section below is a lot to read, but please do your research about pricing and post-education opportunities to become educated before your start at any flight school.

We list all your tuition and non-tuition expenses below, and show that we are substantially less expensive than our competitors.

• Part 141 curriculum approved at every campus means an absolute interest in training quality and safety. The ability to utilize Part 141 and Part 61 training on a course-by-course and "individual student performance" basis allows faster completion and more hours available to students, if there is a need for additional training for proficiency.

• Fly every type of aircraft in our fleet during your program, or stick to one or two. We actually want you to have fun.

• Experience different airspace by flying each course of your program at a different campus location. Fly above the adventures of New York, tour the North Carolina mountains and fly the southern skies in Atlanta. You cannot do that at other schools.

• You've worked hard to become a CFI and we're not going to place you behind a desk with a phone to work Admissions or simply teach ground school. We're going to put you to work in the air so you can log your necessary hours to get to 1500. If you end up enjoying teaching (like we do,) we're not going to ask you to leave as soon as you log those 1500 hours, because we see an immense value in your experience as an educator. You can continue to teach and grow with us if the airlines aren't the right fit for you. The airlines aren't the only career option -- Chief Pilots, Designated Pilot Examiners, Operations Managers, Aviation Safety Inspectors are all in demand.

• Some schools promote an Airline Transport Pilot Certification Training Program (ATCP or FAA-Approved 14 CFR Part 142 Airline Training) as a "perk" to their program, which it isn't. Traditionally, this exact training is provided by the airline you are hired by as a First Officer. Therefore, something that is part of your onboard training with any typical regional airline isn't advertised to look like one of our "perks," as our major competitors do.

Why do we note some of these things so specifically? Because we want you to ask questions and put any flight school you research on the spot. You should get the most out of your training experience and you need to get all the details about what happens when you become a Flight Instructor with your school choice. You should also research how your school choice measures up in producing pilots suited for all types of different careers.

We understand that it's hard to know what to ask, and you're welcome to reach out to our Admissions Team for guidance, even about how to compare flight schools. We want you to compare us with your other choices. We want you to do your research. We're confident you'll be impressed with the programs we have to offer, the individual attention you will receive, and the quality of training you'll experience with Academy of Aviation.

**Why is the information presented here important for you?**

Academy of Aviation is the only Flight School in the nation to have realized ALL of the following under one roof:
• ACCSC Accredited Flight School.
• Our Multiple Campuses are all Part 141 Approved.
• Approved EASA Testing Center and offers EASA ATPL Frozen Course, all in one place.
• Veterans Benefits
• 100% Flight Training Financing
• Airline Partnerships

Like we say in our blogs and our website pages, do your research and PLEASE ask why all of these things matter in the flight training industry, and how the above points can benefit you as a student pilot. Ask one of our admissions reps about anything at all. We'll talk to you and try to give you the most qualified answers to your flight training questions, even if you decide to go elsewhere. We are all human, and we genuinely care about safety, quality and success in the aviation industry. As a relatively smaller school compared to our competition, we pride ourselves in our ability to provide passionate and talented CFIs for every student, with strict oversight of the quality of our flight instruction.

Academy of Aviation

67. Part of the reason that ACCSC withdrew its accreditation of AOA was the fraudulent misrepresentations alleged herein.

68. Now, AOA's website offers no information about its programs, program durations, pricing, or accreditation.

69. The only reasonable inference that can be drawn from the Company's removal of virtually all content regarding its offerings from its website is that it is a tacit acknowledgement of the falsity the content presented.

**V. The "Dematriculation Option"**

70. Rather than remedy the resource shortage, AOA's solution for over-term students was to push them into a "Dematriculation Option," which is a euphemism for withdrawing the student from the structured program and converting them into a pay-as-you-go customer.

71. For example, when Mr. Thomas could not complete the accelerated program by its end date (through no fault of his own), AOA presented him with a form "Program Notice – Dematriculation Option" letter dated May 7, 2024.

72. This letter stated that Mr. Thomas had "chosen to dematriculate from [his] program to avoid being placed on an academic warning or dismissed from the Academy."

73. In truth, this was not a voluntary choice but rather the only option AOA offered short of outright expulsion. The Dematriculation letter acknowledges that Mr. Thomas was "not succeeding under [the] Academic Assessment model or unable to meet the attendance requirements" and thus would be permitted to continue training only on new terms.

74. Under the Dematriculation Option, AOA strips the student of the benefits of their original enrollment (such as fixed lesson pricing, program discounts, and a guaranteed graduation date) and requires the student to pay "Pay as you Fly" at the current prevailing retail rates for any further lessons.

75. The letter to Mr. Thomas, for example, warned that he would have to pay the then-current hourly rates for aircraft and instructor time and manage his own training schedule going forward. It also noted that any existing student account balance could be used for these pay-as-you-go flights, but that any account with 180 days of inactivity would "forfeit all funds" remaining.

76. In sum and substance, AOA told Mr. Thomas: you're no longer an enrolled student with progress monitoring or a timeline; you're essentially an a la carte customer paying higher rates, and if you don't keep flying (and paying) continuously, you lose any money left on account.

77. The Dematriculation letter's language strongly suggests this "option" was coerced. It explicitly says the student "elected to dematriculate … to avoid being placed on an academic warning or dismissed," which places blame on the student's "failure to maintain satisfactory progress" while ignoring that AOA's own failings caused the delays. The letter further states "we can no longer allow continued enrollment with corresponding progress," effectively threatening termination if the student did not agree to dematriculate.

78. This practice applied to many class members: students who timed out of their programs were given ultimatums to either sign onto pay-as-you-go training or be expelled.

79. AOA profited from this by charging dematriculated students significantly more per hour for training than the original program rate.

80. AOA's conduct in imposing the Dematriculation Option on over-term students is part of the fraudulent and unlawful scheme alleged herein.

81. In fact, a material portion of AOA's revenue came from fees charged to students who "timed out" of their initial program allotments–through extensions, pay-as-you-go "dematriculation" conversions, and hourly surcharges at rates of $300–$400 per hour.

82. In other words, AOA's business model was structurally dependent on the very failure it guaranteed by over-enrolling its programs. This is not a function of mere mismanagement; it was intentional and deceptive.

## VI. Discriminatory Treatment of International Students

83. International students on visas faced all the same challenges as domestic students – overbooking, delays, extra costs – compounded by the risk of losing their legal status.

84. Because AOA was authorized by the U.S. Department of Homeland Security to enroll foreign students (via the SEVIS system for M-1 visas), it undertook an aggressive recruitment campaign abroad.

85. At least 88 international students were enrolled in 2023. These students were contractually and legally required to maintain full-time enrollment and make steady progress.

86. AOA's enrollment agreement and orientation materials emphasize the "attendance requirements … to satisfy your I-20" (student visa) obligations. For instance, international students must be on campus at least 22.5 hours per week, with at least 10 hours of flight or simulator training per week, per federal rules. If progress or attendance falters, AOA warns that "Failure to maintain attendance standards can result in expulsion from the school and termination of any applicable visas."

87. The specter of termination of status and deportation was repeatedly impressed upon students like Mr. Zhou.

88. In fact, AOA exploited its leverage over international students who could not complete the program within the initial period by requiring them to apply (and pay $350 SEVIS fees) for extensions or new I-20 visas in order to stay and continue training. The TEA puts the onus squarely on the student to "obtain an extension or reinstatement to their I-20" if they will not finish in time, and warns that AOA's Designated School Official may refuse to sign off on travel or extended breaks, instead terminating the current I-20 and forcing the student to get a new one (with additional fees) for any break in training.

89. In effect, international students had to keep paying and flying at whatever pace AOA demanded, or else lose their visa status.

90. AOA staff explicitly told some foreign students that if they did not promptly pay for additional instruction or an extension, the school would terminate their enrollment in SEVIS (making them immediately out-of-status).

91. This egregious practice constitutes intentional discrimination based on national origin – AOA imposed harsher terms and threats on foreign students that were not imposed on U.S. citizens.

92. Mr. Zhou's experience (as described herein) is representative of the experience of other foreign students who came to the US to pursue training at AOA.

93. This is a heavy and unique burden that AOA imposed only on foreign nationals, effectively leveraging their national origin and visa status to extract more money.

## VII. The Lead Plaintiffs' Experience

### Mr. Feroz's Experience

94. Mr. Feroz enrolled in AOA's "First Flight to First Officer" program on December 13, 2023, with a course start date of January 1, 2024, and a projected graduation date of January 1, 2025.

95. Mr. Feroz paid $80,357.50 in tuition, plus $10,655.00 in non-tuition fees and written and exam fees, for a total of $91,012.50. He obtained financing through Sallie Mae for a total loan of $91,013.00.

96. The TEA for Mr. Feroz's "First Flight to First Officer" program outlined a projected graduation date of January 1, 2025, approximately 12 months after his enrollment date of December 13, 2023.

97. According to Mr. Feroz's TEA, the "First Flight to First Officer" program includes the following certificates and ratings:

- PPL

- IR
- CPS
- CPM
- CFI
- CFII
- MEI

98. As he did not enroll in an accelerated program, Mr. Feroz's TEA states that the "Maximum Course Allotted Time in Days" for him to complete the program was 360 days (*i.e.*, December 26, 2024).

99. Unfortunately, Mr. Feroz encountered the same systemic issues from the start of 2024. Farmingdale's resources were stretched thin by that time, and winter weather further limited flying opportunities. As a result, despite Mr. Feroz's best efforts at completion, his training progress was far below the advertised pace.

100. According to AOA's own records, by mid-2024 Mr. Feroz had not obtained his PPL, even though by the original schedule he should have completed the PPL and IR within the first half of the program. AOA was aware that Mr. Feroz would not meet the January 1, 2025 graduation date – indeed, his TEA specified a maximum allotted time of 360 days (until late December 2024) which has now elapsed without completion. Due to AOA's failure to provide adequate flight instruction slots, Mr. Feroz could not complete the program within the promised timeframe.

101. Throughout late 2024, Mr. Feroz voiced concerns to AOA staff about the slow progress and the looming loan repayment he would face if he did not finish on time. AOA's

response was to repeatedly reassure him that "if you keep showing up, we'll get you there," without disclosing that hardly any student ever "got there" in 12 months.

102. As of the filing of this Complaint, Mr. Feroz remains unenrolled elsewhere and has not received the certificates and ratings for which he paid. He has recently learned that to continue training at AOA beyond the initial period, he would be subject to the Dematriculation Option, meaning he would need to somehow fund additional flight hours at retail rates (approximately $300–$400 per hour) on top of the $91k he already paid. This was never disclosed to him before he enrolled.

103. AOA's false advertising and breach of contract are the direct and proximate cause of Mr. Feroz's damages.

**Mr. Bunch's Experience**

104. Mr. Bunch enrolled in AOA's "Zero to Hero" program on August 15, 2022, with a course start date that same day, and a projected graduation date of August 15, 2023.

105. Mr. Bunch paid $70,225.00 in tuition, plus $9,530.00 in non-tuition fees and written and exam fees, for a total of $79,755.00. He obtained financing through Sallie Mae for a total loan of $80,000.00.

106. The TEA for Mr. Bunch's "Zero to Hero" program outlined a projected graduation date of August 15, 2023, approximately 12 months after his enrollment date of August 15, 2022.

107. According to Mr. Bunch's TEA, the "Zero to Hero" program includes the following certificates and ratings:

- PPL
- IR
- CPS

- CPM
- CFI
- CFII
- MEI

108. As he did not enroll in an accelerated program, Mr. Bunch's TEA states that the "Maximum Course Allotted Time in Days" for him to complete the program was 360 days (*i.e.*, August 10, 2023).

109. At the outset, AOA emphasized to Mr. Bunch that he was in a vocational program monitored for Satisfactory Academic Progress, meaning he needed to hit certain benchmarks each quarter. For example, AOA's guidelines indicate that a student in a 12-month program with multiple ratings should complete roughly half of the ratings by halfway through the program.

110. However, due to AOA's overbooking and lack of resources, Mr. Bunch fell behind from the start. He often could not get on the flight schedule the required 3–4 times per week. By July 2023 – eleven months into the program – Mr. Bunch had logged only about 106.8 flight hours and had not yet obtained even his Private Pilot Certificate.

111. On July 14, 2023, AOA placed Mr. Bunch on Academic Warning for "failure to maintain satisfactory academic progress as stipulated in [his] enrollment agreement dated August 2, 2022." The warning letter reiterated the timeline for his program (*i.e.*, started August 15, 2022 -- to be completed by August 15, 2023) and noted he was in jeopardy of not finishing on time. It warned that if he did not improve, he could face academic probation, loss of program tuition discounts, or even dismissal. Mr. Bunch signed the warning acknowledgment, but there was little he could do to "improve" given the lack of available flight slots.

112. Despite Mr. Bunch's best efforts at completing the program, August 15, 2023, came and went without obtaining the promised certifications. AOA had breached the contract by failing to provide the means for him to finish on time.

113. At that point, Mr. Bunch had expended nearly all of his $80,000 loan. AOA's records reflect that he was still only partway through his instrument rating training by late 2023 – far from the multi-engine instructor rating that was supposed to cap his program. AOA's wrongful conduct left Mr. Bunch in the worst possible position: owing tens of thousands in student loan debt, with no commercial pilot qualifications to show for it.

114. Mr. Bunch could not afford to pay out-of-pocket for additional training at AOA's high hourly rates. Accordingly, Mr. Bunch ceased training at AOA. He effectively paid $80,000 for a PPL that AOA never even allowed him to complete within the year, let alone the advanced ratings.

115. Mr. Bunch's dream of becoming an airline pilot has been derailed. He remains liable for the student loan, which is now in repayment, even as he has had to start over elsewhere to pursue his pilot credentials.

116. AOA's false advertising and breach of contract are the direct and proximate cause of Mr. Bunch's damages.

**<u>Mr. Mendez's Experience</u>**

117. Mr. Mendez enrolled in AOA's PPL program on March 1, 2024, with a course start date of March 9, 2024, and a projected graduation date of June 9, 2024. The PPL was the foundational first step toward Mr. Mendez's goal of eventually becoming a commercial pilot.

118. Mr. Mendez paid $8,850.00 in tuition, plus $2,780.00 in non-tuition fees and written and exam fees, for a total of $11,630.00. He obtained financing through Sallie Mae for a total loan of $11,630.00.

119. The TEA for Mr. Mendez's PPL program outlined a projected graduation date of June 9, 2024, approximately 3 months after his enrollment date of March 1, 2024.

120. According to Mr. Mendez's TEA, the PPL program includes the following certificates and ratings:

- PPL

121. As he did not enroll in an accelerated program, Mr. Mendez's TEA states that the "Maximum Course Allotted Time in Days" for him to complete the "Private Pilot License" was 90 days (*i.e.*, June 7, 2024).

122. AOA assured him that 3 months was plenty of time to obtain a PPL – after all, AOA advertised PPL courses could be finished in as little as 6–8 weeks for full-time students. Mr. Mendez committed to an accelerated schedule, planning to fly several times per week.

123. However, the reality did not match AOA's promises. From the start in March 2024, Mr. Mendez struggled to get even one or two flight lessons per week due to the backlog of other students. He diligently completed ground school study and passed his FAA written exam on schedule, but AOA could not provide the flight hours or instructor availability for him to meet the practical requirements.

124. By early June 2024 (the end of his enrollment period), Mr. Mendez had not completed the required solo flights and checkride preparation for his PPL. In fact, he had accumulated only about half of the flight hours needed. AOA's over-enrollment had made it impossible for him to finish within 90 days.

125. AOA did not formally extend Mr. Mendez's enrollment beyond June 9, 2024. Instead, when he exceeded the 90-day period without completing the PPL, AOA's position was that the "fixed price" no longer applied.

126. Mr. Mendez was informed that to continue training, he would have to either pay on a per-hour basis going forward or enroll in a larger program (with a new loan). Having already spent his budgeted $11,630 for a PPL he did not receive, Mr. Mendez could not afford to pour more money into AOA's coffers. He ultimately withdrew from AOA without obtaining any pilot license.

127. Mr. Mendez thus lost not only the money he paid (now a debt he must repay with interest), but also a year of time and the opportunity to use that time and money at a reputable school. He now must restart his pilot training elsewhere.

128. AOA's false advertising and breach of contract are the direct and proximate cause of Mr. Mendez's damages.

**Mr. Thomas's Experience**

129. Mr. Thomas's case exemplifies the heightened harm caused by AOA's false promises of "accelerated" success. Mr. Thomas enrolled in AOA's "Zero To Hero Accelerated" program on November 3, 2022, with a course start date of November 28, 2022, and a projected graduation date of April 28, 2023.

130. Relying on this representation, Mr. Thomas left his home in Maryland and moved to New York in late 2022 to attend AOA's Farmingdale campus full-time.

131. Mr. Thomas paid $73,975.00 in tuition, plus $7,450.00 in written and exam fees, for a total of $81,425.00. He obtained financing through Sallie Mae for a total loan of $93,200.00, which included $9,670.00 for living expenses.

132. The TEA for Mr. Thomas's "Zero To Hero Accelerated" program outlined a projected graduation date of April 28, 2023, approximately 5 months after his enrollment date of November 28, 2022.

133. According to Mr. Thomas's TEA, the "Zero To Hero Accelerated" program includes the following certificates and ratings:

- PPL
- IR
- CPS
- CPM
- CFI
- CFII
- MEI

134. Mr. Thomas's TEA states that "Maximum Course Allotted Time in Days" for him to complete the program was 360 days (*i.e.*, November 23, 2023), with a "Projected Accelerated Schedule Time in Days" of 150 days (*i.e.*, April 27, 2023).

135. The TEA explicitly stated that "Accelerated Students must attend school six days a week, 8 hours a day, with two lessons on those days," for a total of 12 lessons per week. AOA thus guaranteed Mr. Thomas an extremely intensive training schedule – essentially treating flying like a full-time job.

136. In reality, AOA provided Mr. Thomas nowhere near 12 lessons per week. Initially, for a few weeks in December 2022, he managed to keep apace by flying with different instructors and studying full days. But, by January 2023, scheduling conflicts and aircraft maintenance issues meant he frequently got only a handful of flights per week.

137. As other new students poured in, Mr. Thomas's access to airplanes diminished further. By April 28, 2023 – his projected graduation date – Mr. Thomas had not completed any of the program's ratings. AOA then allowed him to continue training beyond the 5-month mark

(since the TEA's non-accelerated maximum was 360 days, or until late November 2023). However, AOA placed Mr. Thomas on academic Probation around mid-2023 for "unsatisfactory progress," despite the cause being due to AOA's scheduling failures.

138. By the fall of 2023, Mr. Thomas had exhausted his loan funds, yet he still had not achieved the ratings he had purchased through his program.

139. Finally, on May 7, 2024 – more than a year past his original graduation date – AOA effectively gave up on Mr. Thomas's enrollment and issued the "Dematriculation Option" letter described earlier. The letter effectively conceded that Mr. Thomas could not complete the program within the allotted time due to AOA's limitations, stating he had "elected to dematriculate … to avoid being placed on an academic warning or dismissed." AOA thus removed Mr. Thomas from the structured program and offered that he could continue flying if he paid out-of-pocket at the steep hourly rates.

140. Having no remaining loan money and no income (Mr. Thomas had been a full-time student per AOA's requirement), he could not afford to continue. Mr. Thomas left AOA without receiving the PPL, IR, CPS, CPM, CFI, CFII or MEI that were supposed to be included in his $81,000 tuition.

141. Mr. Thomas is now burdened with student loan debt approaching six figures but cannot advance his career as a pilot.

142. AOA's false advertising and breach of contract are the direct and proximate cause of Mr. Thomas' damages.

**Mr. Zhou's Experience**

143. Mr. Zhou's experience highlights both the universal AOA issues and the additional pressure on international students. Mr. Zhou enrolled in AOA's "Private Pilot License," "Instrument Rating," "Commercial Pilot," and "Multi-Engine Add On" flight training programs

on March 13, 2023, with a course start date of March 14, 2023, and a projected graduation date of March 14, 2024. His program was scheduled for 12 months (March 2023 to March 2024) with the expectation he would return home thereafter.

144. Mr. Zhou paid $47,465.00 in tuition, plus $3,775.00 in non-tuition fees, and $3,250.00 in written and exam fees, for a total of $54,490.00. Mr. Zhou self-financed all AOA-related fees and expenses.

145. The TEA for Mr. Zhou's program outlined a projected graduation date of March 14, 2024, approximately one year after his enrollment date of March 13, 2023.

146. According to Mr. Zhou's TEA, he signed up for the following certificates and ratings:

- PPL
- IR
- CPS
- CPM

147. Mr. Zhou's TEA states that the "Maximum Course Allotted Time in Days" for him to complete the program was 120 days (*i.e.*, July 3, 2023).

148. As an international student, Mr. Zhou's M-1 visa eligibility was tied to his continuous progress in this one-year program. Initially, Mr. Zhou devoted himself full-time to training, expecting to complete at least the PPL and IR stages by mid-2023. However, AOA's resource constraints severely impeded him.

149. By July 3, 2023 – roughly 110 days into training – Mr. Zhou had not completed his PPL, even though the TEA contemplated a maximum of 120 days for that phase. In fact, Mr. Zhou

ended up needing far more flight hours than AOA's notional syllabus suggested, because he could only fly sporadically.

150. On August 29, 2023, AOA issued Mr. Zhou an Academic Warning letter similar to Mr. Bunch's that referenced his visa requirements. AOA knew that Mr. Zhou's M-1 visa duration was tied to that schedule and he attended AOA for more than the required 22.5 hours per week, yet AOA's own warning letter to Mr. Zhou in August 2023 shows he was nowhere near on track: "Currently you are at 50.00 total hours working on your Private Pilot Certificate. You are over your quoted hours for Private Pilot and not meeting satisfactory progress." By that point – 5 months into a 12-month program – he should have finished at least his PPL if AOA's timeline were achievable. Instead, he was still struggling to complete his first rating due to lack of flight availability.

151. AOA placed Mr. Zhou on Academic Warning on August 29, 2023, for failing to meet progress benchmarks, and expressly reminded him of the visa rules: "To maintain your nonimmigrant student status, you must remain a full-time student… Failure to comply…will result in loss of your student status and subject you to deportation." Notwithstanding that he was already doing so, the warning letter also recited the 22.5 hours/week attendance rule and implored him to meet it going forward.

152. Despite the warning that effectively blamed Mr. Zhou for AOA's inability to provide sufficient training, as his one-year end date (March 2024) approached, it became clear he would not finish any of the ratings he had signed up for.

153. AOA's Designated School Official informed Mr. Zhou that if he wanted to stay in the U.S. past March 2024 to continue training, he would need to apply for an I-20 extension and

show additional funds. Mr. Zhou was unwilling to pay AOA even more money given the broken promises thus far. Consequently, Mr. Zhou could not complete the program he had paid for.

154. Once his enrollment period expired, AOA terminated his I-20 in SEVIS. Mr. Zhou was required to leave the United States in 2024 without achieving his ultimate goal of becoming a commercial pilot and causing him to lose a large investment of time and money.

155. AOA's discrimination, false advertising and breach of contract are the direct and proximate cause of Mr. Zhou's damages.

**Mr. Feltman's Experience**

156. Mr. Feltman enrolled in AOA's "Zero to Hero" program on January 27, 2023, with a course start date of February 6, 2023, and a projected graduation date of February 6, 2024.

157. Mr. Feltman paid $69,025.00 in tuition, plus $9,555.00 in non-tuition fees and written and exam fees, for a total of $78,580.00. He obtained financing through Sallie Mae.

158. The TEA for Mr. Feltman's "Zero to Hero" program outlined a projected graduation date of February 6, 2024, approximately 12 months after his enrollment date of January 27, 2023.

159. According to Mr. Feltman's TEA, the "Zero to Hero" program includes the following certificates and ratings:

- PPL
- IR
- CPS
- CPM
- CFI
- CFII

- MEI

160. As he did not enroll in an accelerated program, Mr. Feltman's TEA states that the "Maximum Course Allotted Time in Days" for him to complete the program was 360 days (*i.e.*, February 6, 2024).

161. Despite Mr. Feltman's best efforts at completion, February 6, 2024, came and went without obtaining the promised certifications. AOA had breached the contract by failing to provide the means for him to finish on time.

162. At that point, Mr. Feltman had expended nearly all of his Sallie Mae loan. AOA's wrongful conduct left Mr. Feltman in the worst possible position: owing tens of thousands in student loan debt, with no commercial pilot qualifications to show for it.

163. Mr. Feltman could not afford to pay out-of-pocket for additional training at AOA's high hourly rates. Accordingly, Mr. Feltman ceased training at AOA. He effectively paid $70,000 for a PPL that AOA never even allowed him to complete within the year, let alone the advanced ratings.

164. Mr. Feltman's dream of becoming an airline pilot has been derailed. He remains liable for the student loan, which is now in repayment, even as he has had to start over elsewhere to pursue his pilot credentials.

165. AOA's false advertising and breach of contract are the direct and proximate cause of Mr. Feltman's damages.

166. In sum, each Plaintiffs paid AOA large sums based on the expectation of becoming certified pilots within a set timeframe. Not one of the Plaintiffs received the full benefit of their bargain.

167. All Plaintiffs have suffered substantial economic damages (tuition paid or loans incurred, living expenses wasted, loss of income opportunities due to delay) as well as other harms such as emotional distress and reputational injury in the industry.

168. These injuries were directly caused by AOA's common course of conduct: fraudulent over-enrollment, misrepresentation of program lengths and costs, breach of the TEA terms, and, in the case of international students, leveraging immigration status to extract additional payments.

169. The injury is not merely that Plaintiffs were disappointed with the pace or quality of instruction. Plaintiffs paid a price premium for a fixed-cost, time-bounded training product that AOA could not deliver as represented. They also lost the benefit of their bargain because the training opportunities necessary to complete the purchased programs within the TEA time limits were unavailable for reasons controlled by AOA, not by Plaintiffs.

170. Plaintiffs would not have enrolled at AOA, would not have signed their TEAs, would not have incurred Sallie Mae or other financing obligations, would not have relocated or incurred living expenses, and would not have foregone alternative flight-training options had AOA disclosed its actual capacity constraints, historical on-time completion rates, extension/dematriculation practices, and accreditation status.

## VIII. Plaintiffs' and Class Members' Performance of Their Obligations Under the TEAs

171. Each Plaintiff fully performed, or stood ready, willing, and able to perform, all of his obligations under his respective TEA and the Course Catalog incorporated therein, to the extent that such performance was not made impossible or impracticable by AOA's breaches and acts of prevention.

172. Specifically, and without limitation, each Plaintiff: (i) executed his TEA and timely paid, or financed and caused to be paid, all tuition and fees due to AOA under the agreed disbursement schedule; (ii) made himself continuously available for instruction during AOA's operating hours, and (in the case of vocational students) attended AOA on a full-time basis; (iii) attempted to schedule, and used reasonable diligence to maintain, an active flight-training schedule with AOA's scheduling office, including by submitting reservation requests for available flight blocks and instructor time; (iv) attended ground school, classroom instruction, briefings, debriefings, simulator sessions, written examinations, and other required academic and training sessions when AOA made them available; (v) reasonably complied with AOA's academic policies, attendance requirements, and Satisfactory Academic Progress ("SAP") protocols; and (vi) used reasonable efforts to comply with all FAA prerequisites for the certificates and ratings for which he was enrolled.

173. Each Plaintiff also reasonably and repeatedly communicated his concerns regarding the lack of available aircraft, instructor unavailability, repeated lesson cancellations, and impaired training progress to AOA personnel, including to local administrators, instructors, schedulers, and Campus General Managers, in person, by telephone, by email, and through AOA's online scheduling and communication systems, throughout the duration of his enrollment. AOA's response to those communications was uniformly inadequate and confirmed that the underlying cause was AOA's systemic over-enrollment and resource shortfall, and not any failure of performance on the part of any Plaintiff.

174. To the extent any Plaintiff or Class member failed to satisfy any specific attendance, scheduling, or progress requirement during enrollment, such failure was excused by, and proximately caused by, AOA's prior and continuing breaches, including its over-enrollment, its

failure to make a sufficient number of aircraft and instructors available, its acts of prevention, and its anticipatory repudiation of the original program through the unilateral imposition of the so-called "Dematriculation Option." In any event, AOA's issuance of Academic Warning letters to Plaintiffs and its eventual presentation of the Dematriculation Option to Mr. Thomas, demonstrate that AOA continued to treat Plaintiffs as enrolled, performing students throughout the relevant periods.

## CLASS ALLEGATIONS

### I. Proposed Class

175. Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(2), and 23(b)(3).

176. The "Class" that Plaintiffs seek to represent is defined as:

i. All individuals who enrolled in any flight training program offered by AOA at any of its locations since June 2019.

ii. Excluded from the Class are the Defendant, any person, firm, trust, corporation, or other entity related to or affiliated with the Defendant, and any individuals who enrolled in AOA's ACCSC-accredited programs.

### II. Numerosity

177. The Class is so numerous that joinder of all members is impracticable. As alleged above, AOA maintained approximately 700 students concurrently enrolled across its five campuses (Farmingdale, Westchester, Gastonia, Atlanta, and Orlando) from June 2021 to December 2022 alone, and between 300 and 400 students were continuously enrolled at AOA's Farmingdale campus at any given time, including at least 88 international students in 2023. Extrapolated across the five-and-a-half-year class period (June 2019 through March 2024), AOA

enrolled, on information and belief, well in excess of 1,500 students who were subjected to the uniform conduct alleged herein.

178. As further alleged above, AOA itself acknowledged in writing to the ACCSC that students in its non-accredited programs – the programs in which Plaintiffs and the vast majority of Class members enrolled – "almost never complete on time," confirming that a near-universal portion of enrollees suffered the injury described in the Class definition. The number of Class members thus easily exceeds 100, and joinder of all members would be impracticable.

**III. Common Questions of Law and Fact**

179. There are questions of law and fact common to the Class that predominate over any questions affecting only individual members, including but not limited to:

i. Whether AOA intentionally overenrolled students beyond its capacity to provide adequate training;

ii. Whether AOA misrepresented the duration of its flight training programs;

iii. Whether AOA had sufficient aircraft and instructors to allow students to complete their enrolled programs within the advertised timeframes;

iv. Whether AOA's practices violated state consumer protection laws;

v. Whether AOA breached its contracts with students;

vi. Whether AOA's treatment of international students constituted unlawful discrimination;

vii. Whether AOA's conduct constitutes fraudulent misrepresentation or fraudulent inducement;

viii. Whether the Company engaged in willful misconduct; and

ix. The appropriate remedies for the Company's unlawful conduct.

**IV. Typicality**

180. Plaintiffs' claims are typical of the claims of Class members, as all were subjected to the same deceptive practices, unable to complete their programs within the advertised timeframes due to the Company's resource limitations, and either forced to pay additional fees or withdraw from their programs.

**V. Adequacy**

181. Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs have retained counsel competent and experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

**VI. Predominance and Superiority**

182. Common questions of law and fact predominate over any questions affecting only individual members of the Class. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable, the amount at stake for many individual class members is insufficient to make individual litigation feasible, and the expense and burden of individual litigation would make it virtually impossible for members of the Class to redress the wrongs done to them individually.

**VII. Injunctive Relief**

183. AOA has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

184. The Class is ascertainable through AOA's own records, including TEAs, enrollment files, payment records, loan-disbursement records, course-start and projected-completion dates,

flight logs, scheduling records, academic-warning records, extension records, dematriculation records, refund records, and SEVIS/I-20 records for international students.

185. Common proof will predominate because AOA's liability turns principally on uniform representations, standardized TEAs, centralized admissions practices, common capacity constraints, common scheduling systems, common course-duration disclosures, common fixed-cost/price-guarantee representations, and AOA's own aggregated records showing enrollment, aircraft availability, instructor availability, cancellation rates, completion rates, extension charges, and dematriculation outcomes.

## COUNT I
### Deceptive Practices Under N.Y. General Business Law § 349(a)
### (On Behalf of the Class)

186. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

187. N.Y. General Business Law § 349(a) prohibits "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state."

188. The Company engaged in deceptive acts and practices by:

i. Misrepresenting program durations and average completion times;

ii. Enrolling more students than they could reasonably accommodate;

iii. Promising regular flight instruction that they knew they could not provide;

iv. Offering "Fixed-Cost Pricing" and "Price Guarantee" while intending to charge additional fees; and

v. Marketing their programs as accredited when accreditation was in jeopardy or had been withdrawn.

189. These acts and omissions were consumer oriented. AOA's flight training services were offered to the public at large (not unique one-off contracts), and the deception was directed

at consumers (students purchasing educational services for personal/career use). Hundreds of consumers were affected or potentially affected.

190. The challenged practices had a broad impact on consumers at large because AOA used the same consumer-facing marketing architecture to solicit students from the public, including young aspiring pilots, out-of-state students, and international students. The challenged conduct was not a private contractual dispute unique to one student; it was a recurring sales and enrollment model applied across AOA campuses and programs.

191. AOA's deceptive acts were misleading in a material way. Reasonable consumers (*i.e.*, students) would be, and were, misled by AOA's promises of program length and cost. These are material terms of the service – any aspiring pilot would consider the expected duration and required investment as crucial factors.

192. No qualifying language in AOA's marketing materials or in the TEA negates the materially misleading character of AOA's representations. The language that AOA could not "guarantee" that a particular student would not require "additional training and incur some additional expenses" addresses only individualized variations in a particular student's aptitude or piloting skill. That language does not, and could not, disclose – let alone disclaim – the systemic, capacity-based misrepresentation alleged herein: namely, that AOA had knowingly enrolled student volumes far in excess of what its aircraft inventory and instructor staffing could possibly accommodate, rendering completion within the advertised durations a mathematical impossibility for substantially all students regardless of individual ability, effort, or aptitude. A reasonable consumer reading AOA's "your mileage may vary" disclaimer would not understand it to authorize AOA to sell several multiples more training capacity than it could deliver. To the contrary, the disclaimer's reference to differences in individual "piloting skills" affirmatively reinforced the

implicit and explicit representation that AOA had, at a minimum, the threshold operational capacity to provide each enrolled student with reasonable access to the aircraft, instructors, and flight blocks needed to attempt completion within the advertised timeframes.

193. Plaintiffs and Class members actually saw, read, and considered AOA's representations regarding program duration, completion times, frequency of instruction, fixed-cost pricing, and accreditation status before enrolling at AOA and before incurring tuition obligations, as alleged in the "AOA's Uniform Pre-Enrollment Representations" section above. Plaintiffs and Class members reasonably relied on those representations in deciding to enroll at AOA, in deciding to incur tuition and financing obligations, in deciding to relocate for purposes of AOA's programs, and (for international Class members) in deciding to obtain visa sponsorship through AOA.

194. Had Plaintiffs and Class members been told the truth – namely, that AOA had enrolled a multiple of the number of students its fleet could service at the advertised cadence, that AOA's "average completion times" were calculated by excluding the substantial majority of students who failed to complete on time, that AOA's ACCSC accreditation had been placed on probation in May 2022 and withdrawn in March 2023, and that AOA's business model was structurally dependent on extension fees and dematriculation revenue extracted from students who timed out – they would not have enrolled, would not have paid the tuition and fees they paid, and would not have incurred the loan obligations, relocation costs, and lost-income damages they incurred.

195. As a direct and proximate result of the Company's deceptive acts and practices, Plaintiffs and Class members have suffered damages, including financial losses, delayed career progression, and other harm. They paid money to AOA (and took on debt) based on false beliefs

about what they would receive. They lost time and opportunities by committing to AOA's program under false pretenses.

196. Plaintiffs' GBL injuries include out-of-pocket tuition and fees, the difference between the value of the flight-training product as represented and as delivered, loan obligations and interest incurred to purchase the misrepresented programs, replacement-training costs, extension-related charges, and consequential losses flowing from delayed or aborted pilot certification.

197. Accordingly, Plaintiffs seek relief under § 349.

**COUNT II**
**False Advertising Under N.Y. General Business Law § 350**
**(On Behalf of the Class)**

198. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

199. N.Y. General Business Law § 350 prohibits "false advertising in the conduct of any business, trade or commerce or in the furnishing of any service."

200. AOA engaged in false advertising by disseminating advertisements and marketing materials that contained materially misleading information about their flight training programs, including but not limited to:

i. Advertising specific program durations (*e.g.*, 5-month "Zero-to-Hero" program) that were impossible to achieve given the Company's resources;

ii. Promoting a frequency of flight instruction (12 lessons per week) that they could not provide;

iii. Marketing "Fixed-Cost Pricing" and "Price Guarantee" when their business model depended on additional fees; and

iv. Claiming ACCSC accreditation after being placed on probation and ultimately losing accreditation.

201. These advertisements included untrue assertions about program duration, completion rates, pricing guarantees, and AOA's credentials.

202. The false advertising was aimed at consumers and the public. AOA's statements were not isolated internal communications, but rather marketing language on which any prospective student (a member of the public) might rely. The misrepresentations were likely to mislead a reasonable consumer acting reasonably under the circumstances.

203. Plaintiffs and Class Members actually relied on AOA's false advertisements and promotions.

204. The advertisements were materially misleading because they concerned objective, verifiable facts central to the purchasing decision: advertised average completion times, program durations, fixed-cost pricing, accreditation status, and AOA's capacity to provide enough flight blocks and instruction to make those durations achievable.

205. As a direct and proximate result of AOA's false advertising, Plaintiffs and members of the Class suffered injury – losing significant investments of time and money.

**COUNT III**
**Breach of Contract**
**(On Behalf of the Class)**

206. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

207. Each Plaintiff (and class member) entered into a written TEA with AOA, whereby the student paid (or agreed to pay) tuition and fees in exchange for AOA's provision of flight training instruction and related services, to be delivered in accordance with certain terms and timelines.

208. These contracts specified program durations, graduation dates, frequency of instruction, and other material terms. More specifically, each Plaintiff's TEA contains, among others, the following specific and discrete promises by AOA: (i) the named program(s) of enrollment (*e.g.*, "Zero to Hero," "Zero To Hero Accelerated," "First Flight to First Officer," or "Private Pilot License"); (ii) a specified "Projected Graduation Date" (*e.g.*, January 1, 2025 for Mr. Feroz; August 15, 2023 for Mr. Bunch; June 9, 2024 for Mr. Rodriguez; April 28, 2023 for Mr. Thomas; March 14, 2024 for Mr. Zhou; and February 6, 2024 for Mr. Feltman); (iii) a specified "Maximum Course Allotted Time in Days" (*e.g.*, 360 days for the non-accelerated "Zero to Hero" and "First Flight to First Officer" programs, 150 days as the projected accelerated schedule for the "Zero to Hero Accelerated" program, and 90 days for the stand-alone PPL program); (iv) the specific certificates and ratings included within the program (*e.g.*, PPL, IR, CPS, CPM, CFI, CFII, and MEI for the "Zero to Hero" and "First Flight to First Officer" programs); and (v) a fixed program tuition and fee schedule constituting the "Fixed-Cost Pricing" and "Price Guarantee."

209. Plaintiffs and Class members performed their obligations under the contracts by paying the agreed-upon tuition and fees and making themselves available for instruction. As alleged in greater detail in the "Plaintiffs' and Class Members' Performance of Their Obligations Under the TEAs" section above, each Plaintiff fully performed, or stood ready, willing, and able to perform, all of his obligations under his respective TEA and the Course Catalog incorporated therein, including by: (i) executing the TEA and timely paying or financing all tuition and fees due under the agreed disbursement schedule; (ii) making himself continuously available for instruction during AOA's operating hours, and (in the case of vocational students) attending AOA on a full-time basis; (iii) attempting to schedule and using reasonable diligence to maintain an active flight-training schedule with AOA's scheduling office; (iv) attending ground school, classroom

instruction, briefings, debriefings, simulator sessions, written examinations, and other required academic and training sessions when AOA made them available; (v) complying with AOA's academic policies, attendance requirements, and SAP protocols; and (vi) timely and repeatedly communicating his concerns regarding lack of available aircraft, instructor unavailability, lesson cancellations, and impaired training progress to AOA personnel (including local administrators, instructors, schedulers, and Campus General Managers, in person, by telephone, by email, and through AOA's online scheduling and communication systems).

210. To the extent any Plaintiff or Class member failed to satisfy any specific attendance, scheduling, or progress requirement during enrollment, such failure was excused by, and proximately caused by, AOA's prior and continuing breaches, including its over-enrollment, its failure to make a sufficient number of aircraft and instructors available, its acts of prevention, and its anticipatory repudiation of the original program through the unilateral imposition of the so-called "Dematriculation Option."

211. AOA breached the TEAs in multiple respects. The breached contractual promises include, without limitation, the TEA provisions identifying the enrolled course or program, the tuition and fee amounts, the course start date, the projected completion or graduation date, the maximum course allotted time, the included flight-training components, and the incorporated policies governing satisfactory progress, extensions, dematriculation, and completion. Plaintiffs will identify the precise section numbers and attach the relevant TEAs as exhibits if required by the Court.

212. Furthermore, the core promise implicit and explicit in the agreements was that AOA would make a commercially reasonable effort to provide sufficient training opportunities for the

student to complete the program within the stated "Maximum Course Time." AOA breached this by:

i. Failing to provide the frequency of flight instruction promised (e.g., 12 lessons per week for accelerated programs);

ii. Failing to provide sufficient resources (aircraft and instructors) to allow students to complete their programs within the specified timeframes;

iii. Failing to ensure students could graduate by the projected graduation dates; and

iv. Charging additional fees for extensions when students could not complete their programs within the specified timeframes due to AOA's resource limitations.

213. In effect, AOA prevented performance of the contract on the student's side (*i.e.*, the students could not accumulate the required flight experience within the time because AOA did not offer enough lessons).

214. Each Plaintiff's contract similarly was breached when their program end date passed without AOA having provided the promised training opportunities.

215. AOA further breached contract by unilaterally and involuntarily dematriculating students prior to completion, effectively refusing to continue performance under the original contract (and only offering a vastly different, more expensive arrangement).

216. This anticipatory or actual repudiation of the original agreement constitutes breach.

217. As a direct and proximate result of the Company's breaches, Plaintiffs and Class Members suffered damages, including restitution of tuition paid, plus consequential damages such as additional costs incurred by Plaintiffs when trying to obtain training elsewhere, loan interest payments, and lost career income due to delayed entry into pilot jobs.

**COUNT IV**
**Promissory Estoppel**
**(On Behalf of the Class)**

218. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

219. In the event the Court finds no enforceable contract covers a particular aspect of the dispute (or a class member who did not sign a formal TEA), Plaintiffs plead promissory estoppel.

220. This claim is pleaded in the alternative under Rule 8(d). It applies only to promises the Court determines are not governed by an enforceable written contract, including pre-enrollment promises about average completion times, aircraft availability, instructor availability, fixed-cost pricing, accreditation, and the availability of visa-support services, to the extent those promises are found collateral or outside the TEA.

221. AOA made clear and unambiguous promises to Plaintiffs and Class Members regarding program durations, graduation dates, frequency of instruction, and the availability of resources necessary to complete their training.

222. Plaintiffs and Class Members reasonably and foreseeably relied on these promises by enrolling in AOA's programs, paying substantial tuition and fees, relocating to be near AOA's facilities, arranging their financial and personal affairs based on the promised program durations, and in many cases obtaining student loans or other financing.

223. Plaintiffs' and Class Members' reliance on the Company's promises was to their detriment, as they were unable to complete their programs within the promised timeframes, incurred additional costs, experienced delays in their career progression, and suffered other harm.

224. To allow AOA to retain Plaintiffs' payments without delivering on its promises would sanction an injustice.

225. Injustice can only be avoided by enforcing the Company's promises.

**COUNT V**
**Fraudulent Inducement**
**(On Behalf of the Class)**

226. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

227. The Company made material misrepresentations to Plaintiffs and Class Members to induce them to enroll in AOA's programs, including misrepresentations regarding:

i. Program durations and completion times;

ii. Frequency of flight instruction;

iii. Availability of aircraft and instructors;

iv. "Fixed-Cost Pricing" and "Price Guarantee"; and

v. Accreditation status.

228. The misrepresentations alleged herein satisfy the particularity requirements of Federal Rule of Civil Procedure 9(b).

229. For each Plaintiff, the operative misrepresentations were made before he signed his TEA and before he paid or financed tuition. They consisted of the same core statements: that the program could be completed within the advertised or TEA timeframe; that sufficient aircraft, instructors, and lesson blocks would be available; that the fixed-cost or price-guaranteed structure would protect the student from additional completion costs; and, where applicable, that AOA's accreditation and visa-support infrastructure supported the represented program.

230. The speakers were AOA, acting through its CEO, Chris Richards, and through AOA's admissions and marketing personnel acting within the scope of their authority pursuant to standardized scripts and talking points furnished by AOA management.

231. The statements were made in: (i) AOA's academyofaviation.com website, (ii) AOA's printed and electronic marketing brochures and program guides, (iii) AOA's social media

accounts and online advertising, and (iv) telephonic, electronic, and in-person communications with prospective students.

232. The statements were made during the class period (June 2019 through March 2024), and were made to each Plaintiff in the months and weeks leading up to his execution of his TEA, namely, on or about: (i) August 2022 (Mr. Bunch); (ii) November 2022 (Mr. Thomas); (iii) March 2023 (Mr. Zhou); (iv) December 2023 (Mr. Feroz); (v) March 2024 (Mr. Rodriguez); and (vi) January 2023 (Mr. Feltman). The statements were false because the average completion times were much longer than advertised and AOA's actual aircraft and instructor capacity rendered the advertised completion times mathematically impossible at AOA's then-current enrollment levels.

233. AOA's scienter is established by, among other things, AOA's exclusive knowledge of its own aircraft inventory, instructor headcount, and current enrollment, and by AOA's admitted business model of relying on extension fees and dematriculation revenue to monetize students who timed out of the initial program period. Scienter is further established by AOA's own written admission to the ACCSC that students in its non-accredited programs — the programs in which Plaintiffs and the vast majority of Class members enrolled – "almost never complete on time," and by AOA's description of those programs as "not satisfy[ing] . . . standards for excellence in education," "not the best option for aspiring pilots," and in which "most students will likely be unsuccessful." Those internal admissions, made contemporaneously with AOA's public-facing representations of fixed-cost, fixed-duration completion, conclusively establish AOA's knowledge of the falsity of its representations. Scienter is additionally supported by AOA's placement on ACCSC probation in May 2022 (which AOA concealed from prospective students), the ultimate withdrawal of accreditation in March 2023, and the FAA investigation into AOA's deviation from approved syllabi during the same period.

234. AOA knew these representations were false when made, as they were aware that they had enrolled far more students than their resources could accommodate.

235. The Company intended for Plaintiffs and Class Members to rely on these misrepresentations in deciding to enroll in AOA's programs.

236. Plaintiffs and Class Members reasonably relied on these misrepresentations to their detriment. As laypeople or aspiring pilots, Plaintiffs could not have easily discovered the truth on their own (the truth being that AOA was massively over-subscribed). They trusted AOA as a reputable school and had no reason at the time to suspect the promises were fraudulent. The information necessary to evaluate the truth of AOA's representations – including AOA's actual aircraft inventory, instructor headcount, then-current enrollment at each campus, the student-to-aircraft and student-to-instructor ratios, AOA's historical on-time completion rates and the percentage of students forced to extend, dematriculate, or withdraw without completing their programs, AOA's actual reliance on extension fees and dematriculation revenue as a material component of its revenue model, AOA's May 2022 placement on ACCSC probation, and AOA's written admission to the ACCSC that students in its non-accredited programs "almost never complete on time" – was peculiarly and exclusively within AOA's possession and control and was not reasonably ascertainable by Plaintiffs or Class members through ordinary diligence or any "simple investigation."

237. AOA did not disclose any of that information to Plaintiffs or Class members before they signed their TEAs or paid their tuition; nor was it disclosed in the TEA, the Course Catalog, the academyofaviation.com website, or in any of the printed or electronic marketing materials distributed by AOA. Plaintiffs and Class members had no "hints" of the falsity of AOA's representations sufficient to trigger any duty of further inquiry. AOA's generic disclaimer that

completion times might vary based on a student's individual "piloting skills" gave Plaintiffs no reason to investigate, and indeed reinforced, the existence of adequate institutional capacity to support the advertised completion times.

238. As a direct and proximate result of AOA's fraudulent inducement, Plaintiffs and Class Members have suffered damages, including financial losses, delayed career progression, and other harm.

**COUNT VI**
**Fraudulent Misrepresentation and Fraudulent Concealment**
**(On Behalf of the Class)**

239. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

240. The Company made material misrepresentations to Plaintiffs and Class members regarding:

i. Program durations and average completion times;

ii. Frequency of flight instruction;

iii. Availability of aircraft and instructors;

iv. "Fixed-Cost Pricing" and "Price Guarantee"; and

v. Accreditation status.

241. The Company's misrepresentations are pleaded more specifically and with particularity herein, including: (i) AOA's actual aircraft inventory and instructor headcount at each campus; (ii) AOA's actual average completion times including all Plaintiffs and Class members who were unable to complete AOA's programs; (iii) AOA's actual enrollment levels at each campus and the resulting student-to-aircraft and student-to-instructor ratios; (iv) AOA's actual historical on-time completion rates and the percentage of students forced to extend, dematriculate, or withdraw without completing their programs; (v) AOA's placement on probation by ACCSC in

May 2022 and the subsequent withdrawal of accreditation in March 2023; and (vi) AOA's reliance on extension fees and dematriculation revenue as a material component of its business model.

242. AOA had a duty to disclose these facts because they were peculiarly within AOA's exclusive knowledge and not reasonably ascertainable by Plaintiffs and Class members through the exercise of ordinary diligence, and because non-disclosure rendered AOA's affirmative representations regarding program duration, frequency of instruction, fixed-cost pricing, and accreditation status materially misleading. AOA knew that Plaintiffs and Class members were enrolling and paying tuition on the basis of mistaken beliefs that the concealed facts would have dispelled.

243. AOA's omissions also made its affirmative statements materially misleading. Once AOA chose to advertise specific average completion times, fixed-cost pricing, program durations, accreditation, and the availability of sufficient training resources, AOA had a duty not to omit the known facts that rendered those statements misleading, including actual capacity constraints, historical noncompletion, accreditation probation or withdrawal, and the likelihood that students would need extensions or replacement training.

244. These misrepresentations were false and the Company knew they were false when made.

245. AOA made these misrepresentations with the intention that Plaintiffs and Class members would rely on them.

246. Plaintiffs and Class members reasonably relied on these misrepresentations to their detriment.

247. Reliance was reasonable because the concealed facts concerned AOA's internal capacity, enrollment, scheduling, completion, and accreditation data, which were peculiarly within

AOA's knowledge and not available to prospective students through ordinary diligence. No reasonable prospective student could determine from the outside whether hundreds of enrolled students were competing for too few aircraft and instructors, or whether AOA's actual on-time completion rates contradicted its advertised average completion times.

248. As a direct and proximate result of the Company's fraudulent misrepresentations, Plaintiffs and Class members have suffered damages, including financial losses, delayed career progression, and other harm.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the Class, respectfully request the Court to:

(a) Certify the Class pursuant to Fed. R. Civ. P. 23(a) and (b)(2) and (b)(3), and appoint Plaintiffs as Class Representatives and their counsel as Class Counsel;

(b) Declare the Company's conduct to be in violation of the laws cited herein;

(c) Issue appropriate injunctive relief prohibiting AOA from continuing its unlawful practices;

(d) Award compensatory damages to Plaintiffs and Class members, including but not limited to, tuition and fees paid, living expenses, and other costs incurred, in an amount to be determined at trial;

(e) Award statutory damages under N.Y. General Business Law §§ 349 and 350;

(f) Order rescission of Plaintiffs' and Class members' contracts with AOA and restitution of all tuition, fees, and other payments made to the Company;

(g) Award Plaintiffs and the Class their reasonable attorneys' fees, costs, and expenses;

(h) Provide pre- and post-judgment interest; and

(i) Award any other relief deemed just and proper.

**JURY DEMAND**

Plaintiffs, individually and on behalf of the Class, hereby demand a trial by jury on all issues so triable.

Dated: New York, New York
May 18, 2026

Respectfully submitted,

**NEWMAN FERRARA LLP**

*/s/ Jeffrey M. Norton*

Jeffrey M. Norton
Benjamin D. Baker
55 East 59th Street, 17th Floor
New York, New York 10022
(212) 619-5400
jnorton@nfllp.com
bbaker@nfllp.com

*Attorneys for Plaintiff and Proposed Class*